UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SCOTT THOMAS McALPIN,

          Petitioner,

    v.

M.D. McDONALD, Warden,

          Respondent.

_____/

No. C 12-6015 WHA (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING, IN PART, CERTIFICATE OF APPEALABILITY**

## INTRODUCTION

Petitioner, a California prisoner proceeding *pro se*, filed a petition for a writ of habeas corpus challenging his conviction pursuant to 28 U.S.C. 2254. Respondent was ordered to show cause why the writ should not be granted based upon the following claims: (1) the Contra Costa County Superior Court did not have jurisdiction over petitioner's case; (2) ineffective assistance of counsel; (3) prosecutorial misconduct; (4) gender discrimination in the jury selection process; (5) jury instructional error; and (6) the erroneous admission of hearsay evidence. Respondent has filed an answer and a memorandum of points and authorities in support of it. Petitioner has filed a traverse. For the reasons set forth below, the petition is **DENIED**.

## STATEMENT

### I.    PROCEDURAL BACKGROUND

On December 8, 2008, a Contra Costa County jury convicted petitioner of the first-degree murder of his former girlfriend, Annie Melnitchenko, rejecting his claim that he acted in the heat of passion in response to provocation. On January 29, 2009, the trial court found that petitioner had a prior serious violent felony conviction, struck a five-year enhancement for it and sentenced petitioner under the Three Strikes law to fifty years to life in prison.

On direct review, in an unpublished opinion issued on November 29, 2010, the California

Court of Appeal modified the judgment to impose the five-year sentence enhancement and otherwise affirmed the conviction (Exh. 6).   On February 2, 2011, the California Supreme Court denied review (Exh. 8).

On October 28, 2011, petitioner filed a petition for a writ of habeas corpus in the Contra Costa County Superior Court, which was denied on December 22, 2011 (Exhs. 9 and 10).   On January 26, 2012, petitioner filed a petition for a writ of habeas corpus in the California Court of Appeal, which was denied on February 9, 2012 (Exhs. 11 and 12).   On April 18, 2012, petitioner filed a petition for a writ of habeas corpus in the California Supreme Court, which was denied on July 18, 2012 (Exhs. 13 and 14).   On November 14, 2012, petitioner filed the instant federal petition for a writ of habeas corpus.

## II.   FACTUAL BACKGROUND

The Court of Appeal, on direct review, summarized the facts of the case as follows.

### The Relationship

Annie began dating McAlpin in early 2001, and was romantically involved with him off and on until her death on October 22, 2005.  During this time, she reported several incidents of domestic violence.  FN4

> FN4: Annie testified against McAlpin at a July 2003 preliminary hearing on domestic violence charges.  Her testimony was read into the record during trial in this case.

. . .

In October 2003, [McAlpin] entered a guilty plea to multiple felony charges, including: (1) assault with force likely to cause great bodily injury; (2) stalking with a protective order in place; (3) false imprisonment; and (4) first degree burglary.  He also pled guilty to misdemeanor charges for second degree burglary, violation of multiple court orders, harassing phone calls, destruction of telephone equipment, and criminal threats.  He was placed on five years of probation on the condition he serve one year in the county jail, have no contact with Annie, and attend domestic violence counseling.  Annie said she was very upset by the plea agreement and afraid for her safety.  McAlpin was released from jail at the end of 2003.

On August 2, 2004, Annie was treated in the emergency room for injuries from an assault.  She reported that when she left work at 2:30 a.m., her "ex-boyfriend" was waiting for her, stole her purse and cell phone, and attacked her when she ran after him, throwing her to the ground and beating her.

McAlpin was taken into custody, and in December 2004, he pled guilty to felony assault with force likely to cause great bodily injury and was granted probation on the same conditions.  Annie said she could not count on the system to protect her and could protect herself better by maintaining contact with McAlpin so she would know his moods and be able to control the situation.  She said McAlpin would eventually kill her.  McAlpin was again released from jail in the spring of 2005.

United States District Court
For the Northern District of California

Annie's friend, Heidi Barnes testified that McAlpin was intensely jealous and did not believe Annie was faithful despite repeated assurances. Annie told her that on two occasions McAlpin had said "'I love you' while he was strangling her. Once, when she threatened to leave him, he threw her to the floor and choked her, saying, 'Don't leave me . . . but I love you, don't leave me. . . .' More frequently near the end, Annie expressed fear he would kill her: '[H]e said if she ever leaves him, he'll kill her.'"

The People called psychotherapist Marjorie Cusick as an expert in domestic violence to explain the "cycle of violence" and "behavior consistent or inconsistent with . . . a victim of domestic violence." McAlpin presented evidence that Annie visited him in jail, spoke with him by phone during his incarceration and was verbally abusive when she was not allowed to do so. After he was released in 2005, Annie visited his house several times a week and asked to stay with his family. A defense witness said there was a "kind of a back and forth thing between the two of them." Barnes said Annie had a pattern of breaking up with McAlpin and later reconciling with him because "[h]e always promised to change and not hit her anymore. . . ."

The defense contended the relationship was mutually combative and that Annie "had a temper, . . . was moody, and . . . could be provocative and belittling." There was evidence Annie yelled profanity at McAlpin, hit him aggressively, and constantly belittled him—calling him an "idiot," "stupid," "fucking loser," and telling him, "You are not shit. . . . You are less than a man." She also said, "I could send you back to jail in one phone call, so you better do what I say." He was "walking on eggshells" and "doing every little thing to . . . make [her] happy." Barnes agreed that when Annie was angry at McAlpin, she screamed, cursed, and used sexually explicit language.

**Annie's Death and McAlpin's Arrest**

A defense witness testified that Annie seemed upbeat and happy in late September or early October 2005. She and McAlpin were talking about moving in together, and she said "everything would work out fine . . . as long as [he] doesn't make me upset or get me mad and I got to call the cops."

Barnes testified, however, that a month before her death, Annie was crying and shaking and said her heart had been pounding fast and she could not sleep. Annie said she was extremely anxious because she wanted to end her relationship with McAlpin but was afraid he would kill her if she left him. She also said, "I know he's going to kill me. There's nothing that anybody [can] do."

The parties reconstructed the events of the week of October 17, 2005, using cell phone records. The People contended McAlpin could not accept the relationship was over and was stalking Annie. McAlpin contended Annie was calling him too. He was arrested on Tuesday, October 18, 2005, for a probation violation and released the next morning. He called Annie at 1:40 p.m. that day.

When Barnes called McAlpin the night of Wednesday, October 19, 2005, he said Annie had broken up with him and "they were over." He and Barnes went out for a drink that night. McAlpin told Barnes he and Annie had broken up a month earlier and were talking, but "[i]t's over this time, . . . there is no way she's going back to him and he was very devastated." He said Annie told him during a recent phone call "she's going to be sucking another guy's dick on his birthday [Friday, October 21]."

Annie slept at her mother's apartment Thursday night, October 20, 2005. Around 2:30 a.m. that night, McAlpin was seen looking intently into the apartment complex's parking garage,

3

United States District Court
For the Northern District of California

moving from one window to another, "as if looking for something." He told a night staff person for the complex that he was waiting for his girlfriend, and the staff person asked him to leave. McAlpin was seen 40 minutes later jumping over the wall into the pool area.

Annie's mother said Annie left the apartment at 8:45 a.m. Friday morning, October 21, 2005. Security tapes show her with McAlpin at Panda Express at 11:21 a.m. the next day, Saturday, October 22.

McAlpin called his friend Nathan Aguiar at 8:30 or 9:00 a.m. on Sunday, October 23. He was crying and said he had killed Annie, describing the events leading to her death as follows. A couple of days before his birthday, he saw Annie "sucking someone's dick in the parking lot" at the apartment complex where she was staying. He sat there in disbelief but "couldn't take anymore" and went home. Annie called the next day to get together for his birthday. On his birthday, they spent "a wonderful day" at the beach, spent the night together, and made love. The next day, he confronted Annie about what he had seen. At first, she denied the incident but when he pressed the issue, she got angry and yelled, "I sucked his dick, I swallowed his cum, and I fucked other guys too, and I hope it kills you." He slapped her once or twice. When she saw her eye swelling, she said: "This is exactly what I wanted. Now you are going to go back to jail, and I'm going to fuck all of your friends." McAlpin told Aguiar: "I just snapped and started choking her. . . . I choked her to death and she didn't even fight. . . . [B]efore he knew it, it was over. . . ." McAlpin said he was going to kill himself because he could not live without Annie. He said he had taken a bottle of pills, and if that did not work, he would drive off a cliff.

Aguiar called the police, and the responding officer called McAlpin on his cell phone. McAlpin said he told Aguiar his relationship with Annie was dead. He said, "I loved her," then said he meant: "I love her. I love her very much. But we just can't work things out."

At 11:40 a.m. that day, a park ranger saw McAlpin's car in the Marin Headlands, parked against a guard rail by a steep slope. McAlpin was sitting in the driver's seat with his feet on the pavement, vomiting on the road. He said he had been drinking all night. The ranger learned of McAlpin's probation search condition and had the car searched. Annie's body was found in the trunk, along with a half bottle of Smirnoff Ice and a handwritten note to "Dearest Annie:" "I want to start by saying I'm deeply sorry for my actions I have displayed throughout our relationship. I hate myself every day for putting my hands on you." A blood-stained knife was found in the center console. McAlpin tried to flee but was apprehended and placed under arrest. He had deep lacerations to his wrists.

**The Autopsy**

Dr. Ikechi Ogan concluded the cause of death was asphyxiation due to manual strangulation and that the time between Annie's last meal and her death was quite close. Ogan said "[i]t was obvious that the body had undergone some degree of trauma." There were premortem abrasions and contusions on the neck and face and blunt impact trauma to the eye, as well as bruises and scrapes of the same age on the torso, chest, abdomen, and extremities, consistent with an altercation. Defensive wounds were on the hands and arm. He found "scanty" petechial hemorrhages but said the number and distribution of petechia has no bearing on the duration of the strangulation. Ogan said it takes three to five minutes of sustained pressure to kill—longer if there is a struggle. After the victim loses consciousness, pressure must be maintained another minute or two.

Forensic pathologist Paul Herrmann testified for the defense that there is no minimum time to kill by strangulation. Some die within 45 seconds to a minute; others die instantaneously. Death takes longer if the victim struggles. Herrmann said there is no way to know how long it took Annie to die. He noted that compression of the vagus nerve can cause death instantly,

but he said it was not possible to tell if that was what caused Annie's death.  He said that McAlpin did not use a great deal of pressure.

**McAlpin's Neuropsychological Expert**

Dr. Michael Shore opined a prior beating had caused McAlpin mild to moderately severe brain damage, evidenced by impulsivity and deficits in attention, memory, and problem solving.  Shore also opined that McAlpin's "choice-making" and "emotional control" machinery are broken, producing intense, prolonged, inappropriate reactions in emotional or unexpected situations.

**Attorney Argument**

The prosecutor contended McAlpin "was determined to have [Annie] in his life no matter what. . . . [I]f he couldn't have her, no one else would."  Focusing on McAlpin's prior threats, she argued: "[M]urder as a solution to his issues with Annie has been percolating in his head for a long time. . . . This isn't an impulsive one-time . . . situation.  [It] is a . . . planned conclusion to his jealous fears and paranoia."  She said deliberation can occur "with one continuous squeezing until you've squeezed the life out of someone" and that "it takes time to kill in this manner."  Defense counsel maintained McAlpin reacted rashly and impulsively to Annie's provocation and was not guilty of murder.  On rebuttal, the prosecutor contended there was no adequate provocation and McAlpin had overreacted when Annie "had done nothing wrong."  Instead, she argued, McAlpin knew he was going to jail, and "the thought of [Annie] being out there with a life without him was more than he could handle."

Exh. 6 at 2-8.

**ANALYSIS**

**I.     STATUTE OF LIMITATIONS**

Respondent argues that the petition must be dismissed because it is untimely.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") became law on April 24, 1996, and imposed for the first time a statute of limitations on petitions for a writ of habeas corpus filed by state prisoners.  The statute of limitations issue is a threshold question to be decided before reaching the merits of the habeas claims.  *Ford v. Gonzalez*, 683 F.3d 1230, 1238 (9th Cir. 2012).  Under AEDPA, prisoners challenging non-capital state convictions or sentences must file petitions for relief within one year of the date on which the judgment became final after the conclusion of direct review or the time passed for seeking direct review.  28 U.S.C. 2244(d)(1)(A).  Under section 2244(d)(1)(A), direct review includes the ninety-day period within which a petitioner may file a petition for a writ of certiorari from the United States Supreme Court, regardless of whether the petitioner actually filed such a petition.  *Bowen v. Roe*, 188 F.3d 1157, 1159 (9th Cir. 1999).  Thus, the statute of limitations commences to run on the date the ninety-day period expires.

United States District Court
For the Northern District of California

Petitioner's conviction became final on May 5, 2011, ninety days after the California Supreme Court denied his petition for review on February 2, 2011. The one-year deadline for petitioner to file his federal habeas petition was May 5, 2012. He filed his federal petition on November 14, 2012. Therefore, unless statutory or equitable tolling applies, the petition was filed over six months late.

The one-year statute of limitations in AEDPA is tolled under Section 2244(d)(2) for the "time during which a properly filed application for state post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. 2244(d)(2). State law governs whether a state petition is properly filed. *Pace v. DiGuglielmo*, 544 U.S. 408, 414 (2005). "When a post-conviction petition is untimely under state law, 'that [is] the end of the matter' for purposes of

§ 2244(d)(2)." *Id.*

The California Court of Appeal denied the claims in petitioner's state habeas petition, filed on January 26, 2012, as untimely, citing *In re Clark*, 5 Cal. 4th 750, 782-99 (1993) and *In re Robbins*, 18 Cal. 4th 770, 780-81 (1998) (Exh. 12). "California courts signal that a habeas petition is denied as untimely by citing the controlling decisions, i.e., *Clark* and *Robbins*." *Walker v. Martin*, 131 S. Ct. 1120, 1124 (2011); *Thorson v. Palmer*, 479 F.3d 643, 645 (9th Cir. 2007) (state court citation to *Robbins* was clear ruling that state petition was untimely).

Petitioner's subsequent petition to the California Supreme Court was denied without explanation (Exh. 14). It is assumed to have been denied on the same grounds given by the California Court of Appeal. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991) (unexplained orders are "looked through" to the last reasoned decision).

Although petitioner is entitled to statutory tolling for the fifty-six days his state petition was pending in the Contra Costa County Superior Court, he is not entitled to statutory tolling for the period his habeas petitions were pending in the state Court of Appeal and Supreme Court. Thus, he filed his federal petition approximately four months after the statute of limitations expired.

Petitioner argues that his petition is timely because he originally filed a federal petition on July 13, 2011, case number C 11-2939 WHA (PR). In that case, petitioner filed two motions to stay

United States District Court

For the Northern District of California

and abey his petition while he exhausted claims in state court. The Court denied these motions because petitioner did not show good cause for his failure to exhaust the claims prior to filing his federal petition (C 11-2929 WHA, Dkt. no. 7). On October 27, 2011, petitioner requested that the petition be dismissed so that he could exhaust state court remedies. His case was dismissed on that day. The next day, October 28, 2011, petitioner filed his state petition in the Contra Costa County Superior Court.

Without citing authority, petitioner argues that the statute of limitations should be tolled for the three months his federal petition was pending in this Court and for the time his petitions were pending in the state courts. However, federal habeas petitions do not toll the limitations period. *See Duncan v. Walker*, 533 U.S. 167, 180-81 (2001). Furthermore, petitioner fails to address respondent's argument that, because his petitions in the state Court of Appeal and Supreme Court were denied as untimely, tolling does not apply to the time his petitions were pending in those courts. Petitioners' arguments that he is entitled to statutory tolling are without merit.

Petitioner argues that the doctrine of equitable tolling applies to his petition because he suffers from a mental impairment. Section 2244(d) is subject to equitable tolling in appropriate cases. *Holland v. Florida*, 130 S. Ct. 2549, 2560 (2010). "[A] petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Id.* at 2562 (internal quotation marks omitted). The petitioner bears the burden of showing that this "extraordinary exclusion" should apply to him. *Miranda v. Castro*, 292 F.3d 1063, 1065 (9th Cir. 2002). Eligibility for equitable tolling due to mental impairment requires the petitioner to meet a two-part test. "First, a petitioner must show his mental impairment was an extraordinary circumstance beyond his control by demonstrating the impairment was so severe that either (a) petitioner was unable rationally or factually to personally understand the need to timely file, or (b) petitioner's mental state rendered him unable personally to prepare a habeas petition and effectuate its filing." *Bills v. Clark*, 628 F.3d 1092, 1099-1100 (9th Cir. 2010) (citations and footnote omitted). "Second, the petitioner must show diligence in pursuing the claims to the extent he could understand them, but that the mental impairment made it impossible to meet the filing deadline under the totality of the

circumstances, including reasonably available access to assistance." *Id.* at 1100.

In his traverse, petitioner refers to the California Court of Appeal's opinion on direct review summarizing defense witness Dr. Michael Shore's testimony that petitioner has mild to moderately severe brain damage due to a beating that he sustained some time in the past and, thus, his choice-making and emotional control machinery are broken, producing intense, prolonged, inappropriate reactions in emotional or unexpected situations (Trav. 4). Petitioner also indicates that, since his conviction, he "has been hospitalized and on medication for his mental illness" (*Id.*). Although petitioner indicates that he was able to obtain his mental health records from prison officials, (*id.*), he does not submit them with his traverse.

Petitioner's minimal argument regarding a mental impairment does not meet the two-part test enunciated in *Bills*. Thus, petitioner has failed to show the extraordinary circumstances beyond his control necessary to establish equitable tolling. Because equitable tolling does not apply, his federal petition is untimely. Ordinarily, this is sufficient grounds for dismissal. However, both parties have briefed the merits of petitioner's claims and, in the interests of justice, the Court addresses the claims on their merits.

## II.   STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Under 28 U.S.C. 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Id.*; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). Federal habeas relief is available only if the state court's

8

1  application of federal law is "so erroneous that 'there is no possibility fairminded jurists could

2  disagree that the state court's decision conflicts with this Court's precedents.'" *Nevada v. Jackson*,

3  133 S. Ct. 1990, 1992 (2013) (*citing Harrington v. Richter*, 131 S. Ct. 770, 786 (2011)).

4      When there is no reasoned opinion from the highest state court to consider the petitioner's

5  claims, the court looks to the last reasoned opinion from the state courts. *Ylst v. Nunnemaker*, 501

6  U.S. 797, 801-06 (1991).  The last reasoned state court decisions on petitioner's claims are the

7  decision by the California Court of Appeal on direct review, (Exh. 6), and the decision of the Contra

8  Costa Country Superior Court on habeas review, (Exh. 9) .

9  **III.    ISSUES PRESENTED**

10      **A.    JURISDICTION**

11      Petitioner contends that the Contra Costa County Superior Court lacked jurisdiction over his

12  case and it should have been tried in Marin County where the victim's body was found.  Petitioner

13  only cites California legal authority in support of this claim.

14      The Contra Costa County Superior Court denied this claim on habeas review, indicating that

15  there was sufficient evidence to support the inference that the victim had died in Contra Costa

16  County (Exh. 9 at 1-2).  A state court's ruling on a state jurisdictional issue "conclusively

17  establishes" jurisdiction for federal habeas proceedings.  *Wright v. Angelone*, 151 F.3d 151, 158 (4th

18  Cir. 1998); *Rhode v. Olk-Long*, 84 F.3d 284, 287 (8th Cir. 1996).  Thus, this claim does not raise a

19  federal question and cannot be the basis for federal habeas relief.

20      In his traverse, petitioner argues that "the victim was presumed to be killed [on] a federal

21  facility of some sort which was in a state of non-use.  Petitioner was unable to confirm the identity

22  of the land due to its federal designation, but with the court's permission, petitioner will further

23  inquire about this land and wishes leave to due [sic] such" (Traverse 7).  This appears to be an

24  argument that the case should have been tried in federal court.  This argument, which is apparently

25  unexhausted and without evidentiary support, is meritless.

26      The jurisdiction claim does not warrant habeas relief.

27      **B.    INEFFECTIVE ASSISTANCE OF COUNSEL**

28  Petitioner argues that counsel was ineffective because he stipulated that certain statements

9

made by witness Heidi Barnes were not true when he should have moved to have her statement "suppressed." Respondent argues that this claim is procedurally barred because the Court of Appeal and California Supreme Court denied it as untimely.

A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question, and adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). In those cases in which the state court decision is based on an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Id.* at 750. California's practice of barring review of a claim on the merits if the petitioner has "substantially delayed" filing his habeas petition is an independent and adequate state procedural bar. *Walker*, 131 S. Ct. at 1131.

Petitioner first raised his ineffectiveness claim in his habeas petition in the Contra Costa County Superior Court (Exh. 10). The superior court denied the claim for failure to lodge a sufficient record for review (Exh. 10 at 2). The California Court of Appeal and Supreme Court denied the petition as untimely. Thus, unless petitioner shows cause and prejudice, this claim is barred from federal habeas review. Petitioner does not argue cause and prejudice in his petition or traverse. In his traverse, petitioner merely raises the question, "How can the Appellate Court deny all claims as untimely? (Traverse 8)." This is insufficient to show cause and prejudice.

Therefore, this claim is procedurally barred and cannot form the basis for federal habeas relief.

## C.    PROSECUTORIAL MISCONDUCT

Petitioner argues that the prosecutor committed misconduct because she knowingly allowed Ms. Barnes to testify falsely. Respondent argues that this claim is procedurally barred because the state Court of Appeal and Supreme Court denied it as untimely and as barred by *In re Dixon*, 41 Cal. 2d 756, 759 (1953). The *Dixon* rule bars a petitioner from raising a claim in a habeas proceeding that could have been, but was not, raised on appeal. *In re Harris*, 5 Cal. 4th 813, 934 (1993).

The *Dixon* bar rests on independent state law grounds, unless noted otherwise. *Protsman v.*

United States District Court
For the Northern District of California

*Pliler*, 318 F. Supp. 2d 1004, 1007-08 (S.D. Cal. 2004).  Federal courts have upheld application of the *Dixon* bar as adequate where the petitioner has failed to present authority that it is inconsistently applied.  *Id.* at 1008-09; *accord Flores v. Roe*, 228 Fed. Appx. 690, 691 (9th Cir. 2007) (where respondent adequately raised *Dixon* procedural bar defense to petition, burden shifted to petitioner to place the defense at issue by asserting factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule); *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003).

Petitioner first raised his prosecutorial misconduct claim in his habeas petition in the Contra Costa County Superior Court (Exh. 10).  The superior court denied this claim in one sentence: "Finally, as to the claim the prosecutor knowing [sic] allowed perjured testimony, no evidence whatsoever supports such a claim (Exh. 10 at 2)."  As mentioned above, the California Court of Appeal and Supreme Court denied the petition as untimely and pursuant to *Dixon*.

Neither in his petition nor in his traverse does petitioner attempt to overcome the bars of untimeliness and failure to raise the claim on appeal.  Therefore, this claim is procedurally barred and cannot form the basis for federal habeas relief.

### D.   JURY SELECTION

Petitioner argues that the prosecutor purposefully discriminated against women in her use of peremptory challenges of prospective female jurors, in violation of his rights to due process and equal protection.

The Court of Appeal, on direct review, summarized the facts pertaining to this claim.

### 1. Background

Before jury selection, prospective jurors completed lengthy questionnaires.  After voir dire by the court and counsel, the prosecutor used her first two peremptory challenges to excuse Jill P. and Millie A.  She used her next three challenges to excuse Cheryl C., Mary B., and Tammara P.

Noting the prosecutor had used her first five challenges against women, defense counsel made a *Batson/Wheeler* motion, contending she was discriminating based on gender.  The defense argued neither the questionnaire nor the voir dire responses of these women provided a legitimate basis for a prosecution strike and the prosecutor must have challenged them because of their gender.  Without expressly finding the defense had made a prima facie showing of discrimination, the trial court asked the prosecutor, "Do you want to respond to that right now?"

United States District Court
For the Northern District of California

11

The prosecutor noted, "It's a little hard . . . where 50 percent of the population is the protected class to sometimes not have . . . what may appear to be a pattern."  She said her practice was to give prospective jurors a tentative rating based on the questionnaire and that she had done so in this case. She said gender is noted on each questionnaire but not taken into account by her rating system.  She explained: "[P]art of what I'm doing is looking at . . . what the ultimate jury is that I wanted and . . . these jurors that are coming up. . . . [T]here are two main areas I looked at for everyone.  That was their answer to 73 and the answer to the psychiatric questions, which I think are key in this case."  Question 73 asked prospective jurors to indicate their level of agreement (agree strongly, agree somewhat, no opinion, disagree somewhat, or disagree strongly) with the following statements:

• "If a person is arrested, charged with a crime and brought to trial, he is probably guilty of something."

• "A defendant on trial should be required to prove his innocence."

• "If a defendant does not testify at trial he is probably guilty."

• "Regardless of what the law says, a defendant in a criminal trial should be required to prove his or her innocence."

• "Criminals have too many rights."

• "The criminal justice system makes it too hard . . . to convict people. . . ."

• "In general, persons convicted of serious crimes receive lenient sentences. . . ."

The prosecutor said she "would put 'bad' any time they have no opinion or disagree or disagree strongly. . . . From . . . the Prosecution's perspective, even though this didn't make them unfair jurors . . . [to be] challenge[d] for cause, [they are] not the best jurors.  I obviously would like to have [their] initial reactions on the other side."

Questions 81 through 84 asked for prospective jurors' views on mental illness in the context of a criminal trial:

"81. Do you believe that too often mental illness is used as an excuse for bad behavior or the commission of crimes?

82. Do you believe that people with certain types of mental illnesses don't have control over their behavior?

83. If a mental health professional testifies for the defense in this case, would you discount or disbelieve this testimony either because the witness was a mental health expert or because the witness testified for the defense?

84. Do you have any reservations about psychological testimony offered in court on behalf of a defendant?"

The prosecutor indicated that prospective jurors who marked "Yes" on question 82 "came under a bad rating . . . because anybody that [sic ] thinks . . . somebody can't control themselves because of. . . mental illness is . . . not going to be my ideal juror."  She said: [M]y decision here is based on the rating I made based on the objective factors they all answered to and the fact that I know what I have coming up."  She made a record as to why these women were given a "lesser rating than some of the other jurors."

**United States District Court**
For the Northern District of California

**Jill P.**

The prosecutor said Jill P. had "bad" answers on questions 73 and 81 through 83, and "on the mental health area [during voir dire]. . . . [W]ith other jurors . . . coming up, . . . she was not one of my best jurors. . . . [A]nybody [with] 'bad' answers on 73 combined with 'bad' answers on 81 to 83 . . . got a low grade."

**Millie A.**

The prosecutor noted that Millie A. had a degree in psychology, and "I'm not going to keep any . . . juror [with] that outside experience. I don't think there is any way that somebody could have that kind of experience, go to the jury room, and make her decision based on the evidence just presented here."

**Cheryl C.**

The prosecutor said Cheryl C. "had . . . 'bad' answers on No. 73. . . . [S]he has a good friend who works as a licensed mental health worker. I'm trying to avoid anyone [with] . . . outside knowledge of the mental health area. . . . [H]er father abused her mother, and it was never prosecuted." Identifying on the questionnaire any preconceived ideas of how a domestic violence victim should act, Cheryl C. checked both yes and no and wrote "Realistic." The prosecutor said this meant "her initial reaction was she was not sure. She has . . . step children [who] are incarcerated. . . . And . . . [she] might feel . . . empathy for . . . [McAlpin's] parents . . . who . . . would be in court every single day."

**Mary B.**

The prosecutor said Mary B.'s answers were neutral to bad on questions 81 through 84. "She really had very little information to give [on] the questionnaire and in court. I found [it] very difficult to get any information out of her." The prosecutor felt she had "much better jurors coming up. . . ."

**Tammara P.**

The prosecutor said Tammara P.'s answers on question 73 were "bad," "her ex-husband is bipolar[,] and she believes that certain types of mental illnesses, people don't have control over their behavior . . . . She had domestic violence herself, but more importantly, it was by a person who was bipolar. The mental aspect of her abuser was something . . . I am concerned about. She would call her sister who [happened] to be a police officer, but she never called [the police], and anybody [with] domestic violence in their background, I'm going to be a little more cautious of. . . ." The prosecutor said she would not accept a juror with Tammara P.'s responses if she still had challenges or had "jurors . . . coming up."

The trial court gave defense counsel an opportunity to comment but he declined. After taking the matter under submission, the trial court denied the motion: "[The prosecutor] has . . . given plausible justifications for her peremptories with respect to either of the five people [defense counsel] referred to [in his] motion . . ., such that I cannot conclude there was a discriminatory reason for those challenges."

Voir dire resumed and the prosecutor exercised her sixth and seventh peremptory challenges against men and her eighth challenge against Jennifer L. Defense counsel again objected under *Batson/Wheeler* based on the prosecution's peremptory challenge against Jennifer L. The trial court held a hearing on the motion the next morning. At the hearing the prosecutor

13

noted that she had passed on "several" panels that included six women, she had exercised "several" challenges against men, and the most recent panel she had passed on was evenly divided and reflected the percentage of women in the general population (51 percent).

**Jennifer L.**

The prosecutor said Jennifer L.'s answers on question 73 were "bad" and "[o]n 82, . . . she makes the comment, . . . 'Some people do have mental conditions which control their behaviors. We all know this. Hopefully, the experts could sort it out.' The People don't anticipate . . . calling an expert. I'm concerned she would need . . . our side [to] call an expert . . . to make a decision on the mental health issue. She's anti-death penalty. People who are anti-death penalty tend to be less conservative on the jury. She's been a reporter for ten years. Reporters tend to be more liberal people. . . . Any one of those things individually I might not have made this choice. But you put them [all together,] that's why I made the choice."

The trial court denied the motion, stating: "I think the law is clear as long as there is a plausible non-discriminatory exercise. . . . It's such a large class, it's not a minority in the classic sense of that word, that the analysis of whether or not one or more challenges are being exercised for discriminatory reasons becomes somewhat more difficult to make an assessment about. So unless you exercise all of your challenges against men, which would maybe subject you to a challenge in that regard, these are the kind of judgments that are made by attorneys, as long as there is a plausible justification by the attorney for the challenges, which I think there is in this case. . . ."

As jury selection continued, the prosecution passed three more times on a jury panel that included five or six women before she used her ninth and final peremptory challenge against prospective juror Nathalie W.—with no objection from the defense. As sworn, the jury consisted of eight men, four women, and a male alternate.

Exh. 6 at 9-14 (footnote omitted).

The Equal Protection Clause forbids the challenging of potential jurors solely on account of their race or gender. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986) (race); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 130 (1994) (gender). Under *Batson* and *J.E.B.*, a violation of equal protection is established in a three-step process. *Batson*, 476 U.S. at 96-98; *J.E.B.*, 511 U.S. at 144-45. First, the defendant must make a prima facie case that the prosecutor exercised a peremptory challenge on the basis of race or gender "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 93-94; *J.E.B.*, 511 U.S. at 144-45. Second, if the defendant makes a prima facie showing, the burden shifts to the prosecutor to articulate a race or gender-neutral explanation for striking the juror in question. *Batson*, 476 U.S. at 94; *J.E.B.*, 511 U.S. at 145. Finally, if the prosecutor offers a race or gender-neutral explanation for the challenge, the court must determine whether, despite the prosecutor's proffered explanation, the defendant has carried the burden of proving purposeful discrimination. *Batson*, 476 U.S. at 97-98. In doing so, the

United States District Court
For the Northern District of California

court evaluates the totality of the relevant facts. *Ali v. Hickman*, 584 F.3d 1174, 1180 (9th Cir. 2009). In the final step, the court evaluates "'the persuasiveness of the justification' proffered by the prosecutor, but 'the ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the opponent of the strike.'" *Rice v. Collins*, 546 U.S. 333, 338 (2006) (citations omitted).

The findings of the state trial and appellate courts on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review. *Purkett v. Elem*, 514 U.S. 765, 769 (1995); *Mitleider v. Hall*, 391 F.3d 1039, 1050 (9th Cir. 2004); *Williams v. Rhoades*, 354 F.3d 1101, 1108 (9th Cir. 2004). The petitioner must show the state court's conclusion to be "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Id.* (citing 28 U.S.C. § 2254(d)(2)). Therefore, a federal habeas court can only grant habeas relief if it was unreasonable to credit the prosecutor's non-discriminatory explanations for the *Batson* challenge. *Rice*, 546 U.S. at 338.

The California Court of Appeal, after reviewing the relevant state and federal authorities, addressed the third stage of the *Batson* analysis and found that substantial evidence supported the trial court's determination that the prosecutor had no discriminatory intent (Exh. 6 at 15).

The record in this case shows that the Court of Appeal's determination was not an unreasonable determination of the facts. The prosecutor explained that she rated all of the jurors before they were called to the jury box because she had the questionnaires that they had previously completed, and then changed her rating based on their answers during voir dire (Reporter's Transcript ("RT") 671, 674). She also explained that she compared each juror with the jurors coming up in an attempt to get the best jury for the prosecution (RT 672). Most importantly, she provided multiple gender-neutral reasons for excusing each female prospective juror (RT 673-76). She also pointed out that she had rated many prospective female jurors highly, but the defense had excused them (RT 673). Also, the final jury had four female jurors. *See Gonzalez v. Brown*, 585 F.3d 1202, 1210 (9th Cir. 2009) (fact that African-American jurors remained on jury may be considered to be indicative of nondiscriminatory motive). Accordingly, the state court's determination that petitioner failed to carry the burden of persuasion that the prosecutor had acted

with discriminatory intent was not objectively unreasonable in light of the evidence presented in the state court proceeding.

Petitioner argues that it was constitutionally impermissible for the prosecutor to strike a juror on the ground that he or she disagreed with the statement that "regardless of what the law says, a defendant in a criminal trial should be required to prove his innocence," because it is incompatible with the United States Constitution. The Court of Appeal's denial of this argument on the ground that "a prosecutor may use a peremptory challenge on any basis that does not deny equal protection," is not objectively unreasonable. *See Purkett*, 514 U.S. at 767-68 (second stage of *Batson* analysis does not require persuasive or even plausible explanation, as long as it is nondiscriminatory). The prosecutor's rating of jurors based upon their opinions that disagreed with the constitution was nondiscriminatory. Therefore, under *Batson*, it was acceptable.

Petitioner argues that many of the seated jurors answered questions 73 and 82 through 84 in a manner that was indistinguishable from the struck jurors. He raised this argument for the first time on appeal.

Comparative juror analysis, that is, determining whether non-challenged jurors possess any of the characteristics on which the prosecution challenged jurors in the protected group, may tend to prove discrimination at the third *Batson* step. *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005); *Cook v. LaMarque*, 593 F.3d 810, 815 (9th Cir. 2010). However, the retrospective comparison of jurors on the appellate record may be misleading when alleged similarities were not raised at trial. *Snyder v. Louisiana*, 552 U.S. 472, 483 (2008). When reviewing this issue for the first time on appeal, an appellate court must be mindful that an examination of the alleged similarities at the time of the trial might have shown that the jurors in question were not really comparable. *Id.* "Where the state court conducted comparative analysis and determined that the prosecutor did not exercise her peremptory challenges in a discriminatory manner, AEDPA deference applies and we need not undertake comparative analysis de novo." *Briggs v. Grounds*, 682 F.3d 1165, 1171 n.6 (9th Cir. 2012).

The Court of Appeal rejected this claim as follows:

> For the first time on appeal, McAlpin seeks to challenge the credibility of the prosecutor's explanations by a limited "comparative juror analysis" that focuses almost exclusively on the questionnaire responses to questions 73 and 81 through 84. . . .

16

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

McAlpin maintains the majority of the sworn jurors answered questions 73 and 81 through 84 the same as or "in a manner indistinguishable from" the prospective jurors the prosecutor challenged. . . . The record demonstrates that the responses of a number of the seated jurors to question 73 also merited a "bad" rating in the prosecutor's view.  In addition, nine of the seated jurors answered "No" to question 81, indicating they did not believe mental illness was used too often as an excuse, and nine answered "Yes" to question 82, indicating their belief the mentally ill do not have control over their behavior—also "bad" responses for the prosecution.

"Overlapping responses alone are not enough to demonstrate purposeful discrimination." *(People v. Calvin* (2008) 159 Cal. App. 4th 1377, 1389, fn. 4, *citing People v. Lewis and Oliver* (2006) 39 Cal. 4th 970, 1020.)  A side-by-side comparison is necessary to demonstrate the seated jurors were similarly situated.  (*Calvin*, at 1389, fn. 4.)  McAlpin has not provided such a comparison.  Indeed, he considers each question separately without evaluating each juror's responses as a whole.  FN7 "Advocates do not evaluate panelists based on a single answer.  Likewise, reviewing courts should not do so." (*People v. Lenix*, (2008) 44 Cal. 4th 602, 631, fn. omitted.)  Further, "the question is not whether we . . . find the challenged prospective jurors similarly situated . . ., but whether the record shows . . . the party making the peremptory challenges honestly believed them not to be similarly situated in legitimate respects." (*People v. Huggins* (2006) 38 Cal. 4th 175, 233.)

> FN7  For example, McAlpin correctly points out that Tammara P.'s answers on question 73 were the same or better for the prosecution than those of seated Juror No. 4.  He fails to recognize, however, that Juror No. 4's response to question 81 strongly favored the prosecution, as he not only indicated his belief mental illness is used too often as an excuse for criminal behavior but also noted in explanation: "Some people just won't accept responsibility for their own action/choice—and, tend to 'blame' it on other factors."  Moreover, although Juror No. 4 agreed in responding to question 82 that certain mental illnesses could be a factor in bad behavior, he indicated he would require this to be "proven scientifically."  Tammara P., by contrast, provided "bad" answers to both questions, and said during voir dire that her ex-husband's mental illness contributed to his abusive conduct—suggesting she was more likely to find McAlpin's alleged head injury a contributing factor.

McAlpin also is mistaken in his contention that the prosecutor identified the responses to questions 73 and 81 through 84 as the "make-or-break criteria for selecting jurors," the "most important" criteria, and the "primary reasons driving the strikes."  The prosecutor noted the questionnaire responses in discussing her practice of evaluating prospective jurors, indicating they were "key."  Nonetheless, she also set out her other reasons, which as a whole were sufficient to support each challenge.  For the most part, McAlpin does not address these reasons or challenge them on substantial evidence grounds.  FN8  Because he has not done so, we are not persuaded by his contention the trial court erred prejudicially in " 'failing to point out inconsistencies and ask probing questions' regarding [the] manifest disconnect between the prosecutor's asserted reasons [as they related to questions 73 and 81 through 84] and the actual record." (*See People v. Silva* (2001) 25 Cal. 4th 345, 385.)

> FN8  McAlpin contends the record does not show Cheryl C. personally had "outside knowledge of the mental health area," or "that her friend actually worked 'as a licensed mental health worker' in a 'mental health area.'"  "Restorative justice," he argues, has almost "no relationship to . . . mental health services. . . ."  Still, he does not dispute the prosecutor's other reasons for striking Cheryl C.

Exh. 6 at 16-18 (footnotes in original).

17

United States District Court
For the Northern District of California

1    In his petition as on direct appeal, petitioner fails to compare all of the responses of a seated

2    juror side by side against a challenged juror, and refers to only a number of seated jurors whose

3    responses to questions 73 and 82 were the same as the challenged jurors (Petition 27-31).[1]  In his

4    traverse, petitioner expands his analysis to include all seated jurors compared to the challenged

5    jurors, but he still focuses only on questions 73 and 81 to 84 (Traverse 22-28).  As pointed out by the

6    Court of Appeal, petitioner does not address the fact that a juror may have had a "bad" response to

7    the questions on which he focuses, but may have had favorable responses to other questions (Exh. 6

8    at 17, n.7).  Moreover, the prosecutor explained that she started with the questionnaire responses and

9    changed her evaluation of the jurors based on each juror's responses to questions on voir dire and on

10   the jurors "coming up."

11       Based on the record of the state court proceedings, the Court of Appeal's determination that

12   comparative analysis did not show a discriminatory purpose was not objectively unreasonable.

13   Accordingly, this claim is denied.[2]

14       **E.    INSTRUCTIONAL ERROR**

15       Petitioner contends that the jury instructions on provocation and the prosecutor's misconduct

16   in arguing provocation violated his rights to due process and a fair trial.  The California Court of

17   Appeal found that the jury instructions were ambiguous and should have been modified as petitioner

18   had requested in the trial proceedings (Exh. 6 at 22).  However, the Court of Appeal denied the

19   claim, finding that any error was not prejudicial (*Id.*).

20       A challenge to jury instructions generally does not state a federal constitutional claim.

21   *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  To obtain federal habeas relief based on instructional

22   error, the petitioner must demonstrate "that an erroneous instruction so infected the entire trial that

23   the resulting conviction violates due process." *Id.*; *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)*; see*

24   *also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that

---

26   [1]Because the petition includes several exhibits, page references to the petition are to the
     electronic page numbers in the Court's electronic docketing system at Docket No. 1.

27   [2]On direct appeal, petitioner also argued that a statistical analysis supported his claim of gender

28   discrimination in jury selection.  However, he does not present this claim in his federal habeas petition.

18

the instruction is undesirable, erroneous or even universally condemned, but that it violated some [constitutional right].'").  In making its determination, the Court must evaluate the challenged jury instructions "in the context of the overall charge to the jury as a component of the entire trial process."  *Prantil v. California*, 843 F.2d 314, 317 (9th Cir. 1988) (quoting *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir. 1984)).  If constitutional error occurred, the petitioner must show actual prejudice from the error, i.e., that the error had a substantial and injurious effect or influence in determining the jury's verdict, before the court may grant federal habeas relief.  *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

The Court of Appeal, on direct review, summarized the facts pertaining to this claim.

**The Jury Instructions at Issue**

The issue for the jury was not whether McAlpin killed Annie, but whether the killing was a willful, deliberate and premeditated murder, as the prosecution contended, or an offense arising from and mitigated by adequate provocation, as the defense urged.  The jury was instructed that: (1) provocation may reduce murder from first degree to second degree and may reduce murder to voluntary manslaughter (CALCRIM No. 522); (2) a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant acted during a sudden quarrel or in the heat of passion (CALCRIM No. 570); and (3) a killing is excused and not unlawful if it occurred by accident in the heat of passion (CALCRIM No. 511).

McAlpin challenges those elements of the instructions focusing on the issue of provocation, specifically: (1) what constitutes sufficient provocation to reduce an unlawful killing from murder to voluntary manslaughter based on a sudden quarrel or heat of passion (CALCRIM No. 570), and (2) as a circumstance of an accidental killing in the heat of passion (CALCRIM No. 511).  Former CALCRIM No. 570 provided in pertinent part: "It is not enough that the defendant simply was provoked.  The defendant is not allowed to set up his own standard of conduct.  You must decide whether the defendant was provoked and whether the provocation was sufficient.  In deciding whether the provocation was sufficient, consider whether an ordinary person of average disposition would have been provoked *and how such a person would react in the same situation knowing the same facts*."  (Italics added.)  The same language appears in CALCRIM No. 511.  McAlpin asked the trial court to omit the italicized language because it erroneously suggested his *conduct* in reaction to the alleged provocation must be objectively reasonable.  The trial court denied his request, noting provocation is sufficient if it is "such that a reasonable person would react to it in the way that resulted in the person's death[.]"

**Arguments by Counsel**

The prosecutor did not address provocation in her initial argument to the jury.  Defense counsel explained the law regarding adequate provocation to reduce a killing from murder to manslaughter: "Provocation has to be sufficient to cause an average person to act rashly without due deliberation.  [It] does not have to be sufficient to cause an average person to kill someone.  Otherwise manslaughter wouldn't be a crime.  If the person kills someone when it's reasonable to kill someone, it's not a crime. . . . But the provocation does have to be sufficient to cause an average person to act rashly without due deliberation."  Defense counsel contended Annie's "vengeful, harsh words were . . . uttered with sufficient contempt

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

to cause a reasonable person to act rashly."

On rebuttal, the prosecutor argued: "[I]n order to reduce murder to manslaughter the victim has to have committed some provoking provocative act. . . . The . . . thing about manslaughter is you have to . . . judge it by an objective person's standard, an ordinary, normal person. It's not whether the defendant had the brain injury and it caused him to react [and] [t]herefore, it's manslaughter. He doesn't get to set up his own standard. It's whether a normal, objective person would have reacted in that way. Not killing, but reacted in a rash, emotional heat of passion response. We don't care really whether the defendant did or not. We know he reacted in an overreacting way. He murdered her. The question is, [w]ould the victim's actions have caused a normal ordinary person to overreact?"

In contending there was not adequate provocation to support manslaughter, the prosecutor argued that even if the jury believed Annie had made the provocative statements attributed to her, "she had every right to be with any man she wanted" and "[t]he fact that [McAlpin] saw [her engaging in a sexual act with another man], even if that occurred, . . . he would not be justified in killing her." In discussing Annie's alleged statements, the prosecutor argued: "[Annie] finally gets fed up and says, 'Yeah, I did it. I loved it. I'm going to do it again.' Well, you know what? She had every right to respond like that. There is nothing about that situation that puts her to blame. That doesn't give [McAlpin] the right to kill her and then hide her." The prosecutor said even if Annie told McAlpin he was going back to jail, she was going to be with other men, and "'I hope it kills you,' she had every right to have that response" and, even if she made these statements "in a taunting manner, that doesn't excuse his actions."

### Deliberations

The afternoon of the first full day of deliberations, the jury sent the trial court a written request: "We are struggling with the concept of 'reasonable person.' Can you offer any insight there?" (Request No. 6.) After discussing the request with counsel, the trial court responded: "The exact term 'reasonable person' does not appear in the instructions. Could you clarify which instruction or instructions your question concerns[?]" Shortly thereafter, the jury responded on the same request form: "Does the 'ordinary person of average disposition' standard/test cited in the manslaughter definition also apply to determining Murder 1 or Murder 2? 'Standard of conduct'—Similarly, this is cited in manslaughter—Does it also apply to M1, M2?" The trial court noted the jury had "now clarified [it was] referring to the ordinary person of average disposition standard or test cited in the manslaughter definition" and "this apparently explains why they might have been at a jam in their deliberations."

Defense counsel urged the trial court to tell the jury that there is no objective "reasonable person" standard for provocation in considering the degree of murder, citing *People v. Fitzpatrick* (1992) 2 Cal. App. 4th 1285. . . . The trial court responded to the jury's request: "The terms 'ordinary person of average disposition' and 'standard of conduct' relate only to your consideration of whether there was a provocation so as to reduce the offense from murder to manslaughter. Please see Instruction 522 relating to your consideration of provocation as it relates to reducing murder in the first degree to murder in the second degree." FN13

> FN13  CALCRIM No. 522, as given to the jury, provides: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to voluntary manslaughter. The weight and significance of the provocation, if any are for you to decide. If you conclude that the defendant committed murder but was provoked by the victim, consider the provocation in deciding whether the crime was first or second degree murder. When the provocation occurred and the nature of the provocation

20

may be relevant to your consideration of whether the killing occurred with or without deliberation and premeditation.  Also, consider the provocation in deciding whether the defendant committed murder or voluntary manslaughter."

Exh. 6 at 22-25 (two footnotes omitted).

The Court of Appeal next explained California's law of provocation and found that the instruction given by the trial court was ambiguous.

**The Law on Provocation**

"Manslaughter, an unlawful killing without malice, is a lesser included offense of murder. [Citations.]" (*People v. Koontz* (2002) 27 Cal. 4th 1041, 1086; § 192.)"  "[A] defendant who intentionally and unlawfully kills lacks malice . . . when [he] acts in a 'sudden quarrel or heat of passion' (§ 192, subd. (a)). . . ."  [H]eat of passion . . . reduce[s] an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice that otherwise inheres in such a homicide" (*People v. Moye* (2009) 47 Cal. 4th 537, 549; *People v. Carasi* (2008) 44 Cal. 4th 1263, 1306.) " '[T]he factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation . . . caused by the victim. . . .'" (*People v. Avila* (2009) 46 Cal. 4th 680, 705.)

. . .

In determining whether objectively sufficient provocation exists, the question is whether a defendant's resulting mental state, not his conduct, was reasonable in light of the provocation. . . . "The focus is on the provocation—the surrounding circumstances—and whether it was sufficient to cause a reasonable person to act rashly.  How the killer responded to the provocation and the reasonableness of the response is not relevant to sudden quarrel or heat of passion."  (*People v. Najera* (2006) 138 Cal. App. 4th 212, 223. . . .

. . .

We agree with McAlpin that the language of former CALCRIM No. 570 was ambiguous and did not adequately frame the relevant question for the jury: whether he was provoked by circumstances "sufficient to cause an ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." . . . The modifications he requested should have been given.

Exh. 6 at 25-29 (footnotes omitted).

The Court of Appeal then determined that the error was harmless.

**Did the Jury Misunderstand the Law of Provocation?**

As we find the trial court's instructions created an ambiguity regarding the law of provocation, we must determine whether a reasonable likelihood exists that the jury misunderstood and misapplied the instructions. (*Young*, 34 Cal. 4th at 1202.)  "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." (*People v. Letner and Tobin* (2010) 50 Cal. 4th 99, 182.)  We also consider the arguments of counsel. (*Young*, at 1202.)

. . . McAlpin contends "[t]he prosecutor capitalized on the erroneous instruction[s]" during her rebuttal argument "by arguing that manslaughter was not available as a defense if

21

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  [Annie's] purported provocation was conduct within her legal rights, and that manslaughter
2  was not available unless [he] was 'justified in killing her.'" (Underscoring omitted.)
   McAlpin also maintains the prosecutor's arguments emphasized the ambiguity in CALCRIM
3  Nos. 570 and 511 and, in tandem with the erroneous instructions, virtually eliminated
   manslaughter as a possible verdict, as they "wrongfully insist[ed] that not only must the
4  provocation be of a nature that would put a reasonable person in a heat of passion, but also
   that [his] response . . . must be equally reasonable or justified." (Underscoring omitted.)

5  . . .[T]he prosecutor's comments interspersed correct statements of law with erroneous ones,
   thereby creating confusion. . . . Although she initially states the question as "whether a
6  normal, objective person would have reacted in that way. Not killing, but reacted in a rash,
   emotional heat of passion response," she goes on to frame the relevant reaction in terms of
7  conduct: "We know [McAlpin] reacted in an overreacting way. He murdered her. The
   question is, [w]ould the victim's actions have caused a normal ordinary person to overreact?"
8  The jury reasonably could have understood this to mean that defendant overreacted in killing
   Annie and that its task was to determine whether a reasonable person would have had the
9  same overreaction, in other words, whether the alleged provocation would have caused a
   reasonable person to kill. Indeed, during deliberation, the jurors sought clarification of the
10 law on provocation, specifically the applicability of the objective standard, albeit with
   respect to the degree of murder.

11 Nevertheless, a deficit in one instruction may be supplied by another or cured by the
   instructions as a whole. (*People v. Castillo* (1997) 16 Cal. 4th 1009, 1016.) Although the
12 prosecutor characterized the requisite provocation as moving a reasonable person to kill, her
   overall description of voluntary manslaughter was accurate to the extent she focused on the
13 objective circumstances that would cause a reasonable person to act rashly. CALCRIM No.
   570 correctly advised the jury that to be sufficient, the provocation must have been such as to
14 "cause[ ] an ordinary person of average disposition to act rashly and without due
   deliberation, that is, from passion rather than from judgment." And the trial court instructed
15 the jury: "If you believe the attorneys' comments on the law conflicts [sic] with my
   instructions, you must follow my instructions." Absent any indication to the contrary, it
16 must be presumed the jury followed the trial court's instructions and not the prosecutor's
   argument. *(People v. Boyette* (2002) 29 Cal. 4th 381, 436; *Najera*, 138 Cal. App. 4th at 224.)
17

18 Moreover, even if we were to find a reasonable likelihood the jury misunderstood and
   misapplied the law regarding provocation as it relates to voluntary manslaughter, we
19 conclude that any error in this regard was harmless.

20 **Any Instructional Error Was Harmless**

21 Instructional error is not prejudicial if "the jury necessarily resolved the factual question
   adversely to the defendant under other instructions." (*People v. Mincey* (1992) 2 Cal. 4th
22 408, 438–439 [failure to instruct].) In convicting McAlpin of first degree murder, the jury
   necessarily found he "acted willfully, deliberately, and with premeditation." "First degree
23 willful, deliberate, and premeditated murder involves a cold, calculated judgment, including
   one arrived at quickly [citation], and is evidenced by planning activity, a motive to kill, or an
24 exacting manner of death. [Citation.] Such state of mind 'is manifestly inconsistent with
   having acted under the heat of passion—even if that state of mind was achieved after a
25 considerable period of provocatory conduct.' [Citation.]" (*Carasi*, 44 Cal. 4th at 1306;
   *People v. Wharton* (1991) 53 Cal. 3d 522, 572.) The jury was instructed that McAlpin acted
26 willfully "if he intended to kill"; acted deliberately "if he carefully weighed the
   considerations for and against his choice and[,] knowing the consequences, decided to kill";
27 and acted with premeditation "if he decided to kill before committing the act that caused
   death." Thus, the jury necessarily found that McAlpin acted intentionally, weighed his
28 choices, and decided to kill Annie before strangling her.

22

United States District Court
For the Northern District of California

McAlpin contends, however, that in responding to Request No. 6, the trial court "did not in any way explain that the evidence of provocation necessary to reduce the degree of conviction from first-degree murder to second-degree did not have to be judged from a reasonable person's standard; nor did it explain that the evidence of the person's reaction to the provocation for . . . second-degree murder . . . should not be judged from a reasonable person standard." (Underlining omitted.)  It is not clear whether he asserts the trial court's response to the jury's request as error in itself.  If so, he has waived it by failing to support it with reasoned argument and legal authority.  (*See Gray*, 66 Cal. App. 4th at 994.)   If instead, he contends that instructional error under CALCRIM Nos. 570 and 511 also tainted the jury's determination of whether the offense was first or second degree murder, we disagree.  The trial court's response reasonably informed the jury that the provocation standard applicable to manslaughter does not apply to second degree murder and that provocation may be relevant to whether McAlpin acted with deliberation and premeditation.  (See CALCRIM No. 522 [focusing on whether the provocation affected the defendant's ability to premeditate and deliberate, not whether his response was objectively reasonable].)   The jury also was instructed before deliberations began: A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated."  We presume the jury followed that instruction.  (*Avila*, 46 Cal. 4th at 719.)

Exh. 6 at 30-34 (footnotes omitted).

The California Court of Appeal reasonably determined that former CALCRIM 570, reducing unlawful killing from murder to voluntary manslaughter due to provocation, was ambiguous and that the ambiguity was compounded when the prosecutor, in closing argument, interspersed correct statements of the law with erroneous ones.  Consequently, the Court of Appeal concluded that the trial court erred by not changing the instructions as petitioner requested.  Nevertheless, the Court of Appeal denied the claim, finding that the error was not prejudicial because "the jury necessarily resolved the factual question adversely to the defendant under other instructions" (Exh. 6 at 33).

On federal habeas review, if error is found, it must be determined if the error caused prejudice, that is, whether it had a substantial and injurious effect or influence on the jury's verdict. *Calderon*, 525 U.S. at 147.  The error in CALCRIM 570 and CALCRIM 511 did not have a substantial and injurious effect or influence on the verdict because the jury found petitioner guilty of willful, deliberate and premeditated murder, which is inconsistent with manslaughter due to provocation.  In CALCRIM 521, the jury was instructed that petitioner was guilty of first degree murder if the prosecution "proved beyond a reasonable doubt that he acted willfully, deliberately, and with premeditation" (Court Transcript ("CT") 1721).  As noted by the Court of Appeal, CALCRIM 521 defined "willful" and "deliberate" as: "The defendant acted *willfully* if he intended

23

to kill; the defendant acted *deliberately* if he carefully weighed the consideration for and against his choice and, knowing the consequences, decided to kill." (*Id.*) (emphasis in original). The instruction clarified that petitioner acted with "premeditation" if he "decided to kill before committing the act that caused death" and that, "a decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated" (*Id.*). In CAL CRIM 522, the jury was instructed that "provocation may reduce a murder from first degree to second degree and may reduce a murder to voluntary manslaughter. . . . If you conclude that the defendant committed murder but was provoked by the victim, consider the provocation in deciding whether the crime was first or second degree murder. When the provocation occurred and the nature of the provocation may be relevant to your consideration of whether the killing occurred with or without deliberation and premeditation. Also, consider the provocation in deciding whether the defendant committed murder or voluntary manslaughter" (CT 1722). Given these instructions, the fact that the jury found petitioner guilty of first degree premeditated murder necessarily meant that it found that he did not act out of a heat of passion as a result of the victim's provocation. *See People v. Carasi*, 44 Cal. 4th 1263, 1306 (2008) (the state of mind for premeditated murder "is manifestly inconsistent with having acted under the heat of passion—even if that state of mind was achieved after a considerable period of provocatory conduct"). Thus, the instructional error did not have a substantial or injurious effect or influence on the jury's verdict.

Petitioner argues that CALCRIM 522 did not alleviate the prejudice caused by the misstatements of the law on provocation because "the jury should have been informed that if petitioner reacted to the provocation in a manner that was impulsive rather than deliberate, he could not be convicted of first degree murder no matter how unreasonable his reaction was" (Traverse 38). However, as discussed above, CALCRIM 521, the instruction on premeditated murder, informed the jury of exactly this requirement *(See* CT 1721).

Petitioner also argues that the trial court's response to the jury's question pertaining to the concept of "reasonable person" failed to correct the misstatements of the law on provocation and compounded the jury's misunderstanding. The Court of Appeal determined this claim was barred because petitioner failed to support it with reasoned argument or legal authority (Exh. 6 at 34). In

United States District Court
For the Northern District of California

1 his federal petition, petitioner does not clarify the authority on which this claim is based (Petition

2 11).  To the extent that this claim does not raise a federal constitutional issue, it is not cognizable on

3 habeas review.  *See* 28 U.S.C. § 2254(a)*; Rose v. Hodges,* 423 U.S. 19, 21 (1975) (federal habeas

4 court may entertain petition for writ of habeas corpus only on the ground that petitioner is in custody

5 in violation of the Constitution, laws or treaties of the United States).

6       The Court of Appeal also addressed this claim as arguing that the instructional error in

7 CALCRIM Nos. 570 and 511 tainted the jury's determination of whether the offense was first or

8 second degree murder.  As reasonably pointed out by the Court of Appeal, the trial court's response

9 sufficiently answered the jury's question pertaining to the definition of a "reasonable person" and

10 whether it applied in determining first and second degree murder.  The trial court told the jury that

11 the terms, "ordinary person of average disposition," and "standard of conduct," was used only in

12 CALCRIM No. 570, which instructed on whether there was sufficient provocation to reduce murder

13 to manslaughter.  Thus, the court informed the jury that the provocation standard for manslaughter

14 did not apply to second degree murder.  The trial court also referred the jury to CALCRIM 522

15 which instructed that provocation could be relevant to whether there was deliberation and

16 premeditation.   The Court of Appeal pointed out that the jury also was instructed on the elements of

17 premeditation and that "A decision to kill made rashly, impulsively, or without careful consideration

18 is not deliberate or premeditated" (Exh. 6 at 33-34).  Thus, the jury knew the elements of first degree

19 murder and that it could not find petitioner guilty of first degree murder if he acted rashly,

20 impulsively or without careful deliberation.  Evaluating the challenged jury instructions in the

21 context of the overall charge to the jury, the Court of Appeal's conclusion that the jury was

22 sufficiently instructed on the difference between first and second degree murder was not objectively

23 unreasonable.  Furthermore, the California Court of Appeal's interpretation of state law on first

24 degree murder and the provocation necessary to reduce it to a lesser included offense is binding on

25 federal habeas review.  *See Mendez v. Small*, 298 F.3d 1154, 1158 (9th Cir. 2002) ("A state court has

26 the last word on the interpretation of state law.").

27       The Court of Appeal also found that CALCRIM 570, which, except for one short phrase,

28 provided the correct law on provocation, remediated any incorrect statement of the law made by the

25

United States District Court
For the Northern District of California

prosecutor.  The prosecutor's misstatement of the law on provocation was interspersed with correct statements of the law and any confusion over the misstatement was cured by the instruction, "Nothing the attorneys say is evidence.  In their opening remarks and closing arguments, the attorneys discuss the case, but their remarks are not evidence.  Their questions are not evidence.  Only the witnesses' answers are evidence" (CT 1695).   Juries are presumed to follow the court's instructions. *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009); *see also Boyde v. California*, 494 U.S. 370, 384-85 (1990) (arguments of counsel generally carry less weight with jury than instructions from the court; the arguments are described in advance to jury as matters of argument, not evidence); *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974) (court should not lightly infer that prosecutor intended an ambiguous remark to have its most damaging meaning or that jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations).  Based on the foregoing, the Court of Appeal's conclusion that CALCRIM 570 remediated the prosecutor's misstatement of the law was not objectively unreasonable.

Based on the foregoing, habeas relief is denied on the claim of instructional error.

**F. ADMISSION OF HEARSAY EVIDENCE**

Petitioner argues that his due process rights to a fair trial was violated by the admission of Ms. Barnes' testimony that Ms. Melnitchenko believed petitioner would kill her.

The factual background of this claim is as follows.  Petitioner filed a motion in limine seeking to preclude Ms. Barnes' testimony that, a month before Ms. Melnitchenko's murder, she told Ms. Barnes that she thought petitioner was going to kill her.  Petitioner contended that this testimony was inadmissible hearsay.  The trial court admitted this evidence, reasoning that the statement was subject to a hearsay exception because it was relevant to Ms. Melnitchenko's state of mind, which would help explain her actions leading up to her death.

On appeal, petitioner argued that this evidence was not admissible as an exception to the hearsay rule because it was presented to show that Ms. Melnitchenko's belief that petitioner would some day kill her was justified.  The Court of Appeal denied this claim, concluding that Ms. Melnitchenko's statement was not admitted to prove that petitioner killed her because he had conceded this at his trial.  The court ruled that the evidence was admissible to show Ms.

Melnitchenko's state of mind, which was relevant to the jury's determination of whether she had provoked petitioner in the manner he claimed (Exh. 6 at 21).

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999). The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. *Henry*, 197 F.3d at 1031; *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). Although adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness. *Id.* The Ninth Circuit has ruled that the due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995). However, only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. *Jammal*, 926 F.2d at *920*.

This claim fails for three reasons. First, because the United States Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ," a federal habeas court cannot find the state court's evidentiary ruling was an unreasonable application of clearly established federal law under 28 U.S.C. 2254(d)(1). *See Holley*, 568 F.3d at 1101. Under *Holley*, therefore, habeas relief cannot be granted on the claim that the admission of hearsay evidence violated petitioner's right to due process.

Second, the evidence was relevant to the most important issue at trial, whether Ms. Melnitchenko sufficiently provoked petitioner so that first degree murder would be reduced to a lesser included offense. Petitioner's primary defense was that Ms. Melnitchenko provoked him by

27

United States District Court
For the Northern District of California

1   taunting him about her sexual activities with other men and his return to jail.  Ms. Melnitchenko's

2   alleged fear of petitioner was inconsistent with such behavior and, thus, was relevant to the jury's

3   determination of whether she engaged in it.  *See Jammal*, 926 F.2d at 920 (due process violation

4   exists only if no permissible inferences can be drawn from the evidence).

5        Finally, the claim fails because the admission of the evidence was not prejudicial.  To obtain

6   habeas relief on the basis of an evidentiary error, a petitioner must show that the error had "'a

7   substantial and injurious effect' on the verdict.'"  *Dillard v. Roe*, 244 F.3d 758, 767 n.7 (9th Cir.

8   2001) (quoting *Brecht*, 507 U.S. at 623).  Ms. Melnitchenko's statement was cumulative to evidence

9   that petitioner had threatened to kill her and had physically attacked her during their relationship

10  (RT 1861-62, 1873, 2093-2100, 2116-23, 2126, 2133, 2143).  Further, evidence that petitioner

11  waited to kill Ms. Melnitchenko until they were alone together, that he killed her by strangling her,

12  and that he drove around with her body in the trunk of his car for hours after he killed her was more

13  compelling proof of premeditation and deliberation than Ms. Melnitchenko's statement that she

14  thought he would kill her.  Based on the overwhelming evidence that petitioner had previously

15  threatened and attacked Ms. Melnitchenko, the admission of Ms. Barnes' testimony did not have a

16  substantial and injurious effect on the jury's finding that petitioner was guilty of first degree murder.

17       For all these reasons, petitioner's due process claim based on the admission of hearsay

18  evidence is denied.

19  **IV.   CERTIFICATE OF APPEALABILITY**

20       The federal rules governing habeas cases brought by state prisoners require a district court

21  that denies a habeas petition to grant or deny a certificate of appealability in the ruling.  Rule 11(a),

22  Rules Governing 2254 Cases, 28 U.S.C. foll. 2254.

23       A petitioner may not appeal a final order in a federal habeas corpus proceeding without first

24  obtaining a certificate of appealability.  28 U.S.C. 2253(c); Fed. R. App. P. 22(b).  A judge shall

25  grant a certificate of appealability "only if the applicant has made a substantial showing of the denial

26  of a constitutional right."  28 U.S.C. 2253(c)(2).  The certificate must indicate which issues satisfy

27  this standard.  28 U.S.C. 2253(c)(3).  "Where a district court has rejected the constitutional claims on

28  the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must

1    demonstrate that reasonable jurists would find the district court's assessment of the constitutional

2    claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

3        The Court finds that reasonable jurists could find its assessment of the jury selection and

4    instructional error claims debatable or wrong.  Petitioner has not made a substantial showing of the

5    denial of a constitutional right on the other claims in his petition.  Therefore, a certificate of

6    appealability is granted, in part.

7        Petitioner may not appeal the denial of a certificate of appealability in this Court but may

8    seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate

9    Procedure.  See Rule 11(a) of the Rules Governing Section 2254 Cases.

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.

The clerk shall enter judgment in favor of respondent, and close the file.

**IT IS SO ORDERED.**

Dated: December ___5___, 2013.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

29